UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA
26-42 (DWF/JFD)

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | GOVERNMENT'S OPPOSITION |
| v. | ) | TO DEFENDANT'S MOTION TO |
| | ) | REVOKE DETENTION ORDER |
| JOSE ALBERTO RAMIREZ, | ) | |
| a/k/a JOSE ALBERTO RAMIREZ, JR., | ) | |
| | ) | |
| Defendant. | ) | |

The United States of America, by and through its undersigned attorneys, hereby respectfully submits its opposition to the defendant's motion to revoke the detention orders issued in this matter. (ECF 25) Based on the totality of the record and the 18 U.S.C. § 3142(f) factors, the government posits that continued detention is warranted because there is no condition or combination of conditions that will reasonably assure the defendant's appearance as required or the safety of any other person or the community should the defendant be released pending trial. 18 U.S.C. § 3142(g). Accordingly, the Court should deny the defendant's motion to revoke the detention order.

<u>INTRODUCTION</u>

In support of its opposition, the government submitted in advance 15 Exhibits to the Court on a thumb drive, via interoffice delivery to the Court's Chambers.[1] The Exhibits are described as follows:

---

[1] True and correct copies of these 15 Exhibits were also delivered to the defendant's attorney of record, Sarah Gad, Esq., via upload to USAfx.

| Ex | Description / Contents |
|----|------------------------|
| 1 | FBI 302 Report re 01.29.26 arrest and transport of Ramirez |
| 2 | 3m 39s segment 01.29.26 BWC (12:07:51-12:11:30) processing attempt |
| 3 | 2m 37s segment 01.29.26 BWC (12:12:32-12:15:09) processing attempt |
| 4 | 1m 21s segment 01.29.26 BWC (12:15:43-12:17:04) processing attempt |
| 5 | 0m 26s segment 01.29.26 BWC (12:17:20-12:17:46) processing attempt |
| 6 | 0m 34s segment 01.29.26 BWC (12:19:41-12:20:15) processing attempt |
| 7 | 0m 9s segment 01.29.26 BWC (12:21:30-12:21:39) processing attempt |
| 8 | 0m 31s segment 01.29.26 BWC (12:23:52-12:24:23) processing attempt |
| 9 | 0m 56s segment 01.29.26 Station Video (2:06:02-2:06:58) resist fingerprints |
| 10 | 0m 44s segment 01.29.26 Station Video (2:21:25-2:22:09) carry out of room |
| 11 | 0m 47s segment 01.29.26 Squad Video (12:48:22-12:49:09) transport |
| 12 | 0m 29s segment 01.29.26 Squad Video (1:10:11-1:10:40) transport |
| 13 | 0m 14s segment 01.29.26 Squad Video (1:11:13-1:11:27) transport |
| 14 | 0m 22s segment 01.29.26 Squad Video (2:01:53-2:02:15) transport |
| 15 | 0m 13s segment 01.29.26 Squad Video (2:02:43-2:02:56) transport |

RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

The government incorporates by reference the fulsome facts contained in the Affidavit filed in support of the Criminal Complaint issued on January 28, 2026 in File Number 26-mj-95 (DJF). (ECF 1-1) In summary, the alleged victim in this matter is an FBI Special Agent whose work and personal information (along with about 10 to 15 other FBI employees' information) was broadcast on social media following a violent protest in response to an immigration enforcement officer-involved shooting in Minneapolis on January 14, 2026. (Id.) The FBI had initially responded to the scene to investigate the shooting incident and was not part of the immigration enforcement action. During the protest, two FBI vehicles were significantly damaged and ransacked, leading to the FBI personnel's work and personal information being broadcast on social media. Soon thereafter, FBI personnel began receiving threatening texts, voicemails, and calls to their work phones from unknown numbers.

As it relates to this case, on or about January 15, 2026, the victim Special Agent's work cellphone received a voicemail and two texts from cell phone number 224-490-xxxx, between 6:01 and 6:03 a.m.  Investigation determined the cell phone number belongs to and is used by the defendant. (ECF 1-1, ¶¶ 17-21)  The 6:01 a.m. voicemail, which was approximately seven-seconds long, stated:  *"Whatup [Victim's First Name]? You bitch ass n\*\*\*a. Your day will come n\*\*\*a. Bitch ass n\*\*\*a."*[2]  At approximately 6:02 and 6:03 a.m., the victim's work cellphone received two text messages from the same 224-490-xxxx cell phone number, which stated, *"[Victim's Full Name], Yahahahahhahaha bitch ass n\*\*\*a, I know where your mom lives bro. And your dad. And your kids buddy."* and *"Get home safe and fast."* (Redacted image below):



---

[2] The caller used a common and accurate variation of the Victim Special Agent's first name.

3

The FBI arrested the defendant on the Complaint-Warrant on January 29, 2026 at his place of employment in Barrington, Illinois. (GE 1) The defendant had his cell phone (224-490-xxxx) on his person and it was seized as evidence. (GE 1 at 3) Arresting agents transported the defendant to the local police station and informed him of the charge alleged in the Complaint. The defendant became extremely agitated, belligerent, and combative, loudly swearing at agents and officers, making veiled threats that "all you motherf**rs are going down," (e.g., GE 2), and that he was going "all the f**king way," (e.g., GE 4), threatening to sue them until he dies (e.g., GE 7), and obstructed the booking process by repeatedly refusing to be fingerprinted or photographed by the FBI for nearly one hour. (GEs 1-8) (*See also* ECF 25-1 at 11-12.) The defendant repeatedly called the agents variations of "bitch ass motherf**rs," (e.g., GE 5), and "bitch ass n****s," (e.g., GE 10). The defendant told agents and officers several times that they would need to force him or beat him to take his fingerprints. (e.g., GE 1 at 2; GE 6, 7, 8)

Agents transported the defendant to the local FBI field office to attempt to process him there, but the defendant continued obstructing process during the transport and at the field office. (GE 1 at 2; GE 9-10, 11-15) During the transport, the defendant removed his seatbelt and began moving about the rear of the squad and stated that "he would be gone forever." (GE 1 at 2) The defendant again told agents that they would need to force him, fight him, or beat him to take his prints. (e.g., GE 11, 14, 15) He again made veiled threats, telling agents to see how far he's really going to go, which he then claimed was not a threat. (GE 11) He also

threatened to put agents' information "all over" social media, "names and everything," (e.g., GE 1 at 2, GE 12, 13).

At the FBI Field Office, the defendant continued to obstruct processing and refused to be fingerprinted, forcing agents to hold him down to take his prints, force his mouth open to take a DNA booking swab, and hold his head so that he could be photographed. (GE 1 at 3, GE 9) The defendant falsely claimed that an agent was choking him, while the station video shows the defendant seated and the agent simply standing next to him. (GE 9) After making agents restrain him to fingerprint and photograph him, the defendant refused to walk back out of the processing room, and told agents to carry him out of the room, stating, "Bitch ass n***a, carry me then, n***a, carry me, n***a," (GE 10). As the defendant was led out into the hallway back to the squad for transport, he is heard yelling at agents to "please drop me, drop me on my face." (Id.)

Agents took the defendant to a hospital, as he claimed he needed medical attention. (GE 1 at 3-4) After the defendant was cleared medically, agents transported him to the local jail. (GE 1 at 4, 7) During the transport, the defendant told agents that "he would be released from custody and not detained, and that once he was released, law enforcement would never see him again." (GE 1 at 4, 8; ECF 25-1 at 16)

On January 30, 2026, the defendant made his initial appearance in the Northern District of Illinois, on the Complaint-Warrant filed in this matter. *See United States v. Ramirez*, No. 1:26-cr-00046, Order (N.D. Ill. Jan. 30, 2026) (ECF No.

2).  The Northern District of Illinois Pretrial Services Report recommended detention based on both risk of non-appearance and danger.  *See id.* (N.D. Ill. Feb. 2, 2026) (ECF No. 7).  On February 3, 2026, the Court in that District held an evidentiary detention hearing and ordered the defendant detained pending further proceedings and removed to the District of Minnesota.  *See id.* (N.D. Ill. Feb. 3, 2026) (ECF No. 8).  *See also* DE 4, 02/03/26 N.D. Ill. Detention Hr'g Tr., filed as ECF 25-1, at 38.

On February 10, 2026, the defendant made his initial appearance in this District, and was ordered detained.  (ECF 11, 13)  The Pretrial Services Report Addendum filed in this District also recommended detention on both risk of non-appearance and danger.  (ECF 20)  The Court ordered the defendant detained.  (ECF 13)

On February 12, 2026, a grand jury returned a one-count Indictment charging the defendant with Interstate Transmission of a Threat to Injure, in violation of 18 U.S.C. § 875(c), which carries a statutory maximum of five-years' imprisonment, for the alleged threatening voicemail and texts described above and in the Complaint affidavit.  (ECF 16)

On March 4, 2026, the defendant filed his motion to revoke the detention order under 18 U.S.C. §  3145(b).  (ECF 25)

<u>ARGUMENT</u>

"Under 18 U.S.C. § 3145(b), a person ordered detained by a magistrate judge may file, with the court having original jurisdiction over the offense, a motion for

6

revocation or amendment of the detention order." *United States v. Goree*, No. 19-266(1) (NEB/KMM) (unpub. Order), 2020 WL 490995, at *1 (D. Minn. Jan. 30, 2020).

Under § 3142(f), a judicial officer must conduct a detention hearing to determine whether any condition or combination of conditions of bond will reasonably assure the appearance of an arrested person or the safety of any other person and the community. *See* 18 U.S.C. § 3142(f). The factors the judicial officer must consider are:

(1) the nature and circumstances of the offense charged, including whether the offense is a crime of violence, a violation of section 1591, a Federal crime of terrorism, or involves a minor victim or a controlled substance, firearm, explosive, or destructive device;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including—

(A)   the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B)   whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal, or completion of sentence for an offense under Federal, State, or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

18 U.S.C. § 3142(g).

Pretrial detention shall be ordered upon *either* (1) a showing by clear and convincing evidence that release will result in danger any person or to the community; *or* (2) a showing by a preponderance of the evidence that release will result in a serious risk of flight. *See United States v. Abad*, 350 F.3d 793, 797 (8th Cir. 2003); *United States v. Sazenski*, 806 F.2d 846, 848 (8th Cir. 1986).

Considering the factors outlined in § 3142(g), continued detention is warranted on both a risk of non-appearance and a risk of safety. Accordingly, the Court should deny the motion to revoke the detention orders because there are no conditions or combination of conditions that would reasonable assure the appearance of the defendant as required at future proceedings or the safety of the community.

A. The Nature and Circumstances of the Offense

As noted above, the nature and circumstances of the alleged offense involves interstate transmission of a threat to injure, a stat-max five-year felony. On January 15, 2026, the defendant allegedly left an early morning threatening voicemail message for, and sent two threatening and vulgar texts immediately thereafter to, a federal agent, whose personal and work information was broadcast the night prior on social media—something the defendant at least twice threatened to do to the arresting federal agents. The voicemail message also used harassing and vulgar language—similar to the vulgar language the defendant repeatedly used against the arresting agents while obstructing processing for nearly two hours—and threatened that the victim-agent's "day will come." The two text messages that immediately followed were arguably even more harassing and threatening—directed at the victim-agent's parents and children—asserting that the defendant allegedly knew where they lived, and imploring the victim-agent to "get home safe and fast," arguably causing concern and fear about immediate pending harm to the victim-agent's immediate family members.

Moreover, the defendant made veiled threats against the arresting agents that they were going to go down and that they would see how far the defendant would go, arguably as revenge against the arresting agents for the defendant's allegations of wrongful arrest and embarrassment at his place of employment. The defendant also told agents that if he were released, law enforcement would never see him again.

B.  <u>The Weight of the Evidence</u>

The victim-agent's toll records show that the voicemail and immediately following text messages were made from a cellular phone number associated with the defendant. The defendant was in possession of the cell phone with that number at the time of his arrest at his place of employment. Agents dialed the cell number that left the voicemail and text messages on the victim-agent's work cell, and the defendant's cell phone rang. (GE 1) The defendant referred to the cell phone as his cell phone multiple times while in the custody of the arresting agents, asking them where his phone was and telling agents they could not search his phone. While obstructing processing for nearly two hours, the defendant also used identical epithets against the arresting agents as he did with the victim-agent, namely "bitch ass n***a."

The defendant also has a recent prior history of allegedly making threats as detailed in the Complaint affidavit. (ECF 1-1, ¶ 18; See also ECF 25-1, at 14). In October 2024, a former employer reported to police that the defendant (with the same reported cell phone number as alleged in the current offense) was terminated for threatening to shoot another employee, and the defendant allegedly sent threatening

9

messages that he would be returning to the workplace despite being fired.  (ECF 1-1, ¶ 18.)

C.     The History and Characteristics of the Defendant

According to the Northern District of Illinois bond report, the defendant is 28 years old and has five prior felony convictions, including a 2018 retail theft of merchandise, a 2018 burglary, a 2020 identity theft, a 2020 "mob action" with use of force or violence, and a 2023 residential burglary, for which the defendant was on probation at the time of the instant alleged offense.  The defendant also has a 2018 domestic battery – bodily harm misdemeanor, involving a physical altercation with his stepfather.  At least 7 other felony charges and 2 battery/physical contact misdemeanors were dismissed as part of plea agreements resulting in the five felony convictions.

The defendant has a fairly extensive history of failing to follow court orders and not appearing for court, including at least 20 failures to appear and 9 violations of probation, at least 5 of which resulted in revocations and additional jail time.  At least four warrants have been issued for the defendant's arrest, and his probation has been terminated unsatisfactorily four times, most recently in 2023.  This history, when coupled with the defendant's alleged statement that if released he would never be seen again, weighs in favor of continued detention.

The defendant has no ties to Minnesota, was apparently homeless prior to 2021, does not have a high school diploma or GED, and has a self-reported history of gang involvement when he was 16 to 18 years old.  The defendant also has an

emotional and behavioral health history that has previously resulted in hospitalization, as recently as 2024. To the defendant's credit, he does have a steady and regular employment history, mostly in the restaurant history.

D. The Nature and Seriousness of the Danger to any Person or the Community

Given the nature of the alleged charge, the defendant's rage and belligerence in obstructing his processing by arresting agents for nearly two hours, the veiled threats the defendant made to arresting agents, and his recent history of reported threatening behavior involving a former employer, the nature and seriousness of the danger to any person and the community here is significant and weighs in favor of continued detention.

## CONCLUSION

In sum, taking into account the § 3142 factors, the totality of the circumstances of this case, and the defendant's history, there are no conditions or combination of conditions that will reasonably assure the appearance of the defendant as required or the safety of any other person and the community, if the defendant were to be released on bond. *Abad*, 350 F.3d at 797.

While the defendant asserts that at the time the defendant was ordered detained, the court did not have a verified third-party custodial plan, among other things, (ECF 25 at 9), the bond report specifically stated that the defendant's girlfriend was "willing to serve as a third-party custodian and/or co-signer." (N.D. Ill. Feb. 2, 2026 bond report, ECF No. 7, at 2)

The United States respectfully requests that the Court deny the defendant's motion to revoke the prior detention orders.

Dated:  <u>March 13, 2026</u>             Respectfully submitted,

                                          DANIEL N. ROSEN
                                          United States Attorney

                                          <u>/s/ *Benjamin Bejar*          </u>
                                      BY:  BENJAMIN BEJAR
                                          Assistant United States Attorney
                                          District of Minnesota